**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **INMOBILARIA AXIAL, S.A. de C.V.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-07-CV-269-KC** |
| | § | |
| **ROBLES INTERNATIONAL** | § | |
| **SERVICES, INC.,** | § | |
| | § | |
| **Defendant**. | § | |

**ORDER**

On this day, the Court considered the following motions:  Plaintiff Inmobilaria Axial,

S.A. de C.V.'s ("Axial") Second Motion for Partial Summary Judgment ("Plaintiff's Motion")

(Doc. No. 99), Axial's Supplemental Motion for Summary Judgment ("Plaintiff's Supplemental

Motion") (Doc. No. 103), and Defendant Robles International Services, Inc.'s ("Robles") Motion

for Partial Summary Judgment for All Claims Relating to the Lease and Guaranty Agreements

("Defendant's Motion") (Doc. No. 95).  For reasons set forth below, Plaintiff's Motion is

**GRANTED** in part and **DENIED** in part.  Plaintiff's Supplemental Motion is **GRANTED** in

part and **DENIED** in part.  Defendant's Motion is **DENIED**.

**I.      BACKGROUND**

The following facts are undisputed.  The facts are taken from Axial's Revised Undisputed

Facts.  *See* Pl.'s Second Mot. for Partial Summ. J. App. A ("Undisputed Facts") (Doc. No. 98).

Robles has acknowledged that the facts presented by Axial are "a true and accurate

representation" of its position.  *See* Def.'s Resp. in Opp'n to Pl.'s Second Mot. for Partial Summ.

J. Ex. A at 1 ("Def.'s Resp. to Undisputed Facts") (Doc. No. 106-1) (acknowledging same but noting that many of the facts presented are irrelevant and should be disregarded as such).

Axial is a corporation organized under the laws of Mexico.  Pl.'s Second Am. Compl. ¶ 1 ("Compl.") (Doc. No. 67).  Axial develops, leases and sells commercial real estate in Ciudad Juarez, Mexico.  Undisputed Facts ¶ 3.  Robles is a corporation organized under the laws of Texas.  Compl. ¶ 2.  Robles provides various services to twin-plant operations, including warehousing services.  Undisputed Facts ¶ 44.  Ernesto Robles is the president and majority stockholder of Robles.  *Id.* ¶ 42.

Prior to 1996, a trust was created between Axial and Maria Avvocato Valverde Vioda de Clarke ("Maria Clarke") on behalf of the Clarke family, owners of real property located at Blvd. Independencia No. 7451-H in Ciudad Juarez, Chihuahua, Mexico ("Building H") ("Clarke-Axial Trust").  *Id.* ¶ 2; Compl. ¶ 5.  According to the Clarke-Axial Trust, the Clarkes would contribute land and Axial would provide buildings and infrastructure.  Undisputed Facts ¶ 2.  The proceeds from the development would be divided among Axial and the Clarke family according to the value of each party's contribution.  *Id.*  Under the Clarke-Axial Trust, the fiduciary Mexican bank ("Bancomer") "was required to take possession of monies received in rent or from the sale of property and distribute [the funds] to Clarke and Axial, and [Bancomer] had to sign the lease contracts."  *Id.* ¶ 90.  Once the trust agreement was executed, the Clarke-Axial Trust became the owner of Building H.  *Id.* ¶ 1.

In 1999, the Clarke-Axial Trust was revised ("revised Trust").[1]  *Id.*  ¶ 9.  Among the

---

[1]              Maria Clarke and Juan Alvarez Gottwald ("Alvarez"),
             principal stockholder and sole administrator of Axial, were
             signatories to the revised Trust.  *See* Def.'s Resp. in Opp'n to

revisions was the elimination of a provision that had existed in the original Clarke-Axial Trust which specifically permitted Axial to lease property owned by the Clarke-Axial Trust.  *Id.* According to Axial, the purpose of this modification was to give the parties "more freedom to carry out the real estate leasing business as described in the joint venture agreement" by eliminating the need for the parties to obtain Bancomer's approval prior to leasing the property. *See id.* ¶¶ 9, 90; Pl.'s Mot. 13.  Robles, however, argues that one purpose of the revision was to prevent Axial from continuing to lease the property.  Undisputed Facts ¶ 4.  Nevertheless, after the Clarke-Axial Trust was revised, Axial continued to lease the property and the Clarke family continued to receive and accept a portion of the lease revenue until May 2006 when the parties became involved in a legal dispute and Axial ceased making payments to the Clarke family.  *See* Rudy Joel Clarke Dep. 78:3-87:5, Jun. 12, 2008 ("Clarke Dep.").

On or about June 2, 2006, Axial entered into a lease agreement with Dublan Distribuidora Dublan de Mexico, S.A. de C.V. ("Dublan").  Compl. ¶ 5; Pl.'s Mot. Ex. 2-A ("Lease Agreement").  The Lease Agreement was signed on behalf of Dublan by Ernesto Robles, the sole administrator of Dublan from September 13, 2005, to 2008.[2]  *See* Lease Agreement; Undisputed Facts ¶¶ 59, 61.  Dublan was to lease Building H from Axial beginning on June 5, 2006, and

---

Pl.'s Second Mot. for Partial Summ. J. 11 ("Def.'s Resp.") (Doc. No. 106).  Maria Clarke died in 2002, leaving four sons as her sole surviving heirs.  *See* Rudy Joel Clarke Dep. 6:8-23, Jun. 12, 2008 ("Clarke Dep.").  After her death, Maria Clarke's sons entered into a co-ownership agreement for the property.  *Id.* 7:9-18.  One of her sons, Rudy Joel Clarke ("Clarke"), is the manager of the co-ownership agreement and the executor of Maria Clarke's estate.  *Id.*

[2]  Ernesto Robles also owns sixty percent (60%) of Dublan's stock; however, he claims that he has never received any money, in the form of dividends or otherwise, from Dublan. Undisputed Facts ¶¶ 42, 62.

ending on June 5, 2007.  Lease Agreement ¶ 2; Undisputed Facts ¶ 14.  Ernesto Robles also

signed a Guaranty Agreement on behalf of Robles, guaranteeing Dublan's performance of the

Lease Agreement.  Pl.'s Mot. Ex. 1 ("Guaranty Agreement"); Undisputed Facts ¶ 15.  Axial also

claims that Dublan entered into a month-to-month lease agreement, with a company for which

Axial was the assignee, for property located at Blvd. Independencia No. 7451-B in Ciudad

Juarez, Chihuahua, Mexico ("Building B") and Blvd. Independencia No. 7451 in Ciudad Juarez,

Chihuahua, Mexico ("parking lot").  *See* Compl. ¶ 6.

      Prior to the termination of the Building B lease, Robles tendered a check to Axial in the

amount of $41,987.51, representing the rent owed by Dublan through the end of February 2007

on Building B.[3]  Undisputed Facts ¶ 16.  Robles's bank dishonored the check for reasons of

insufficient funds.  *Id.*  On or about March 9, 2007, Robles tendered a second check to Axial in

the amount of $10,083.34, representing the rent owed by Dublan through the end of February

2007 on the parking lot.[4]  *Id.* ¶ 17.  This check was also returned for insufficient funds.  *Id.*

      Axial alleges that, on or about April 2007, Dublan defaulted on the Lease Agreement for

Building H.  Compl. ¶ 9.  In June 2007 Axial sued Dublan to terminate the lease.  Undisputed

---

[3]    This fact is included among Axial's Undisputed Facts, to which Robles had no objections; however, it appears from the evidence that Robles disputes the claim that the dishonored check was issued as rental payment for Building B.  *See* Def.'s Resp. 15 ("There is evidence that [Axial's principal stockholder and sole administrator] was notified both orally and in writing that the check was to be applied as payment for Building H and that he was aware of such terms.").

[4]    This fact similarly appears to be disputed by Robles despite its assertion that Axial's Undisputed Facts are "a true and accurate representation" of Robles's position.  *See* Def.'s Resp. to Undisputed Facts; Def.'s Resp. 15; *see also supra* text accompanying note 3.

Facts ¶ 103.  Axial further claims that, beginning in June 2007, Dublan began accruing a thirty-five percent (35%) holdover premium pursuant to the Lease Agreement.  Compl. ¶ 9; Lease Agreement ¶ 18.  Axial claims that Dublan did not vacate the building until December 2007 and that, under the Guaranty Agreement, Robles owes it all outstanding lease payments owed to it by Dublan, including the thirty-five percent (35%) holdover premium for each month beginning in June 2007 and continuing until December 2007.[5]  Pl.'s Mot. 20.  According to Axial's calculations, this amounts to $466,539.50.  *Id.* at 21.  Axial further claims that Robles is liable to it for $52,070.85, the amount of the dishonored checks, along with "the amount of any outstanding utility bills on the Building H premises and the cost of any repairs necessary to return the premises to Axial in the condition it was received by Dublan, excepting normal usage."  Compl. ¶ 18.  Axial has calculated these amounts as totaling $60,956.81 in damages to the property and $2,833.42 for an outstanding electric bill.  Pl.'s Suppl. Mot. ¶ 10.  In addition, Axial seeks "pre- and post- judgment interest as provided by law, costs of court, including legal fees in both Mexico and the U.S., and all other relief, in law or equity," to which it may be entitled.  Compl. ¶ 20.

For its part, Robles argues that Axial did not have the power to lease the disputed property.  Def.'s Resp. in Opp'n to Pl.'s Second Mot for Partial Summ. J. 4-14 ("Def.'s Resp.") (Doc. No. 106); *see also* Def.'s Mot. 1-3.  As such, it claims that the Lease Agreement is void

---

[5]       The date on which Axial claims that Dublan surrendered building H is unclear.  In its Motion, Axial claims that it recovered the building in December 2007.  Pl.'s Mot. 20.  In contrast, in its Undisputed Facts, Axial states that Dublan turned over the keys to building H in "October-November."  Undisputed Facts ¶ 103.  However, as Robles appears to contest any alleged holdover, this is a matter to be determined at trial.

and that it is under no legal obligation to guarantee Dublan's performance on the invalid Lease

Agreement.  Def.'s Resp. 4-7.

## II.      DISCUSSION

### A.      Standard

Summary judgment is required "if the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2); *see also Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006).

The substantive law identifies which facts are material.  *See Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).  A

dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Ellison*, 85 F.3d at 189.

"[The] party seeking summary judgment always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of [the

record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*,

477 U.S. at 323; *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).  If the

moving party meets its initial burden, the nonmoving party "must – by affidavits or as otherwise

provided in this rule – set out specific facts showing a genuine issue for trial." FED. R. CIV. P.

56(e)(2).  The nonmovant's burden may not be satisfied by "conclusory allegations,

unsubstantiated assertions, or only a scintilla of evidence." *Warfield*, 436 F.3d at 557 (quoting

*Freeman v. Texas Dep't of Criminal Justice*, 369 F.3d 854, 860 (5th Cir. 2004)).  Factual

controversies are to be resolved in favor of the nonmovant, "but only when there is an actual

controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

The need to interpret foreign law does not create a genuine issue of material fact for summary judgment purposes.  *See Trans Chem. Ltd. v. China Nat'l Mach. Imp. & Exp. Corp.*, 978 F. Supp. 266, 275 (S.D. Tex. 1997) (citing *Banco de Credito Indus., S.A. v. Tesoreria Gen.*, 990 F.2d 827, 838 (5th Cir. 1993)).

> This conclusion seems obvious in light of Rule 44.1's mandate that such a determination shall be treated as a ruling on a question of law.  Thus, even differences of opinion on the content, applicability, or interpretation of the foreign provision may not be characterized as a genuine issue as to any material fact under Rule 56.

*Banco de Credito Indus., S.A.*, 990 F.2d at 838 (quoting John R. Brown, *44.1 Ways to Prove Foreign Law*, 9 Mar. Law. 179, 194 (1984) (citing Fed. R. Civ. P. 44.1, 56) (internal quotation marks omitted)).

### B.  Analysis

Both Axial and Robles have filed cross-motions for summary judgment.  *See generally* Pl.'s Mot.; Pl.'s Suppl. Mot.; Def.'s Mot.  The Court addresses each motion in turn.

### 1.  Axial's Second Motion for Partial Summary Judgment and Supplemental Motion for Summary Judgment

Axial raises several issues in its Motion and Supplemental Motion, namely:  1) whether the Guaranty Agreement is enforceable independent of the Lease Agreement's validity and, if not, whether the Lease Agreement is legally enforceable under the laws of Mexico; 2) whether Axial can recover the thirty-five percent (35%) holdover premium for Dublan's alleged holdover;

3) whether Robles is liable for damage to the property and unpaid utility bills that Axial paid on

Dublan's behalf; 4) whether Robles is liable to Axial for the dishonored checks it drafted; and

lastly, 5) whether Robles is liable for the attorneys' fees and costs that Axial has incurred in

pursuing this lawsuit.  The Court will address each issue below.

### a.    The Guaranty Agreement

As an initial matter, Axial claims that, even if the underlying Lease Agreement between

it and Dublan were deemed void, the Guaranty Agreement remains enforceable.  Pl.'s Mot. 19.

Robles argues that, because the underlying Lease Agreement between Axial and Dublan is void

as exceeding the scope of Axial's power under the revised Trust, the Guaranty Agreement is

unenforceable.  Def.'s Resp. 2, 6 (translating Article 2107 of the Civil Code of Chihuahua as

stating that "[a] judicial act which is non-existent because of lack of consent or of an object to

which it may refer, *produces no legal effect whatsoever*") (emphasis added).[6]

It is undisputed that the Guaranty Agreement between Axial and Robles "shall be

construed and enforced in accordance with the laws of the State of Texas."  Guaranty Agreement

¶ 9.  Under Texas state law, "an unconditional guarantor is [generally] liable for payment even

though the holder of the note cannot enforce the claim against the principal obligor (the maker),

unless the claim against the principal obligor is void for illegality."  *Untied States v. Little Joe*

*Trawlers, Inc.*, 776 F.2d 1249, 1252 (5th Cir. 1985) (citing *Houston Sash & Door Co. v. Heaner*,

577 S.W.2d 217 (Tex. 1979); *Universal Metals & Mach., Inc. v. Bohart*, 539 S.W.2d 874 (Tex.

---

[6]        Robles's Response does not indicate that its translation
includes emphasis absent from the original text; however, the
Court assumes this to be true.

1976); *Nat'l City Bank v. Taylor*, 293 S.W. 613 (Tex. Civ. App. 1927); *Fuqua v. Pabst Brewing Co.*, 38 S.W. 29 (Tex. 1896); *Howard v. Smith*, 38 S.W. 15 (Tex. 1896)).  In the instant case, the Guaranty Agreement indicates that Robles is an unconditional guarantor.  *See* Pl.'s Mot. Ex. 1 ¶ 6 (stating that "the Lessor may at its option proceed in the first instance against Guarantor"); s*ee also Koonsman v. Comstock*, No. 05-92-02712-CV, 1994 WL 60783, at *5 (Tex. Ct. App. Feb. 16, 1994) (defining an unconditional guaranty for payment as one which waives any requirements that the beneficiary under the guaranty agreement proceed against the debtor before holding the guarantor liable) (citing *Bohart*, 539 S.W.2d at 877).  Accordingly, Robles may be liable to Axial even if the Lease Agreement were found to be unenforceable against Dublan.

However, "[t]he rights of guarantors must be determined from the language of the contract."  *Little Joe Trawlers, Inc.*, 776 F.2d at 1252 (citing *United States v. R & D One Stop Records, Inc.*, 661 F.2d 433, 434 (5th Cir. 1981); *Mid-States Gen. Agency, Inc. v. Bank of Tex.*, 450 S.W.2d 428, 431 (Tex. Civ. App. 1970)).  The Guaranty Agreement states that "[n]othing contained herein shall impose upon Guarantor any greater or different liability than is or may be imposed on said COMPANY under the Lease Agreement except to pay the Lessor attorney's fees, cost and expenses of collection incurred in proceeding against Guarantor hereunder." Guaranty Agreement ¶ 2.  In addition, it states that

> [i]f the COMPANY's liability for the performance of the lease obligations is reduced or discharged as a result of action or failure to act by Lessor, which action or failure to act constitutes a breach of Lessor's contractual obligations to COMPANY under the Lease Agreement, then in such event Guarantor's liability shall be reduced or discharged to the same extent as the reduction or discharge in COMPANY's liability.

*Id.* ¶ 10.a.

According to the language of the Guaranty Agreement, Robles's obligations are commensurate

-9-

with Dublan's obligations under the referenced Lease Agreement, collection expenses

notwithstanding.  Therefore, whether Robles is liable for Dublan's default depends on the

validity of the underlying Lease Agreement, a question of Mexican law.

### b.    The Lease Agreement

Axial contends that the Lease Agreement is valid under Mexican law and therefore the

Guaranty Agreement is enforceable against Robles.  Pl.'s Mot. 7.  In contrast, Robles claims that

the Lease Agreement is invalid because it exceeded Axial's scope of authority under the revised

Trust and consequently violates Mexican law.  Def.'s Mot. 2, 6.  As such, it argues that summary

judgment should be awarded in its favor.  *See id.*  As the Lease Agreement was drafted pursuant

to the laws of Mexico, the Court must look to foreign law in order to determine its validity.

"In determining foreign law, the court may consider any relevant material or source,

including testimony, whether or not submitted by a party or admissible under the Federal Rules

of Evidence."  FED. R. CIV. P. 44.1.  "[T]he court's role is . . . to determine the credibility of the

affidavit testimony and to assess the potentially conflicting analyses of foreign law contained in

the affidavits and the weight they should carry in deciding the foreign law issue."  9 HON.

CHARLES R. RICHEY, MOORE'S FEDERAL PRACTICE § 44.1.04 (Matthew Bender 3d ed.).

Although courts may consider any relevant materials, *see Grupo Protexa, S.A. v. All American

Marine Slip*, 20 F.3d 1224, 1239 (5th Cir. 1994) (citing *Merck & Co. v. United States Int'l Trade

Com.*, 774 F.2d 483, 488 (5th Cir. 1985)), "expert testimony accompanied by extracts from

foreign legal materials has been and will likely continue to be the basic mode of proving foreign

law."  *Universe Sales Co. v. Silver Castle, Ltd.*, 182 F.3d 1036, 1038 (9th Cir. 1999); *see also

Ramsay v. Boeing Co.*, 432 F.2d 592, 602 (5th Cir. 1970) (adopting expert testimony supported

by treatise); *Diaz v. Se. Drilling Co.*, 324 F. Supp. 1, 7 (N.D. Tex. 1969) (relying upon expert testimony, excerpts from Argentinian Civil Code, and other evidence).

The parties agree that the original Clarke-Axial Trust permitted Axial to lease Building H.  Undisputed Facts ¶ 90.  Although the revised Trust eliminated any reference to leasing, it did not explicitly prohibit leasing either.  *Id.*  Instead, the revised Trust gave Axial the "*uso y approvechamiento*," translated as "use and enjoyment," of the property.  *See* Pl.'s Mot. Ex. 4 at 5 ("Calvo Opinion") (translating Clause Ten of the revised Trust to read "[t]hat the TRUSTEE keeps the property of the real estate in trust, allowing the SECOND TRUSTOR (*AXIAL*) the use and enjoyment of same . . . .").  Thus, the dispute appears to turn on whether the power to lease is included in the term "use and enjoyment."

Both parties agree that "[w]hen a contract's terms are clear, the interpreter looks exclusively at the document.  But if the terms are unclear, the contract can be interpreted using other evidence."  Undisputed Facts ¶ 28.  The parties also agree that one of the most important factors in interpreting a contract is the intent of the parties and that one way to establish the parties' intent is to evaluate the parties' own interpretation of any ambiguous terms.  *Id.* ¶¶ 29-30.

In support of its Motion, Axial  has provided the testimony of two attorneys, Victor Manuel Gomez Luevano ("Gomez") and Victor Maneul Cardenas Aldama ("Cardenas").  *See* Pl.'s Mot. Exs. 6 ("Gomez Opinion"), 6A ("Gomez Suppl. Opinion"), 5 ("Cardenas Opinion").  Both attorneys claim that the revised Trust grants Axial the right to lease the property based on their interpretation of the phrase "use and enjoyment."  Pl.'s Mot. 7-8; Victor Manuel Gomez Luevano Dep. 41:24-42:5, 80:14-84:3, Jun. 18, 2008 ("Gomez Dep.") (indicating that "use and enjoyment" includes the authority to lease); Victor Manuel Cardenas Aldama Dep. 61:2-24, Jun.

-11-

24, 2008 ("Cardenas Dep.") (same).  The phrase "*uso y approvechamiento*" does not appear in the Civil Code of Chihuahua, but Gomez contends that the phrase is similar to the term "*usufructo*," which does appear.  Gomez Dep. 76:21-77:13.  According to Gomez, while "*usufructo*" does not explicitly grant the right to lease, it grants the beneficiary the right to "obtain the benefit of" the real estate, which may include the right to lease.  Gomez Dep. 43:12-44:16.  Although Axial only cites American case law interpreting the English term "usufruct" and does not provide any treatise or scholarly work from Mexico examining the meaning of the term, *see* Pl.'s Mot. 10 (citing *Marshall v. Marshall,* 735 S.W.2d 587, 598 (Tex. Ct. App. 1987)), Robles's expert, Roberto Jose Calvo Ponton ("Calvo"), appears to agree that the term "*approvechamiento*" includes "[g]etting the commercial benefit of a property" and "normally would incorporate the right to lease commercial property."  Roberto Jose Calvo Ponton Dep. 61:16-62:7, Apr. 30, 2008 ("Calvo Dep.").

However, Calvo goes on to explain that, while "*approvechamiento*" generally includes the right to lease, an accurate interpretation of the term "[d]epend[s] on the context of the agreement."  Calvo Dep. 62:10.  Based on his analysis of the context of the revised Trust, Calvo concludes that the phrase "did not include within its purposes the lease of any property held by the Trust, and consequently, Building H, being a part of said Trust, could not be the subject matter of any lease agreement."  Calvo Opinion 9.  Calvo bases his opinion on the following facts:  1) the absence of the express right to lease the property in the revised Trust; 2) the omission of this right in light of its inclusion in the original Clarke-Axial Trust; 3) the stated purpose of the trust modification, which was to make the development and commercialization of the property more efficient; and 4) the advanced age of Maria Clarke at the time of the Clarke-

Axial Trust's revision.  *See* Def.'s Mot. 1-2; Undisputed Facts ¶ 23 (citing Calvo Opinion 34-37).

Although the revised Trust does not expressly grant Axial the power to lease the property, Axial's explanation for the modification, namely, that its purpose was to facilitate leasing by eliminating Bancomer as the middleman in leasing transactions, is at least equally plausible as the explanation proposed by Robles.  *See* Undisputed Facts ¶ 90.  In fact, Axial's interpretation was originally shared by Clarke, though he has since changed his mind.  *See* Rudy Joel Clarke Dep. 100:6-20, Jun. 12, 2008 ("Clarke Dep.").[7]  Cardenas, the trustee of the Clarke-Axial Trust, also shares Axial's interpretation, stating that the parties intended to allow Axial to continue leasing the property when they revised the Trust and that the purpose of the modification was to "give agility to the real estate business."  Cardenas Dep. 58:22-24, 61:14-17.  Furthermore, despite Robles's claims to the contrary, Axial's interpretation is consistent with the stated purpose of the revised Trust, which was to facilitate the commercialization and development of the property.

Calvo also claims that, because Maria Clarke was ninety-two years old when the Clarke-Axial Trust was revised, it is unlikely that she would have agreed to continue leasing the property

---

[7]     Although Clarke was not a party to the revised Trust, as noted previously, the signatory to the revised Trust, Maria Clarke, died in 2002, leaving Clarke and his three brothers as her sole surviving heirs.  Clarke Dep. 6:8-7:15.  As Maria Clarke died before the execution of the Lease Agreement at issue in this case, the Court cannot look to her actions with respect to the Lease Agreement to determine whether she intended the revision to include the power to lease.  *See id.* 7:12-15.  However, as Clarke and his brothers currently have an ownership interest in the disputed property, the Court finds their behavior with respect to the Lease Agreement instructive.  Even if the revised Trust were ambiguous with respect to Axial's power to lease, Clarke's acceptance of the proceeds appears to ratify Axial's understanding that the revised Trust permitted it to lease the property.

because she would have received a greater benefit from its sale.  Calvo Dep. 35:9-21 ("I don't think that there was any way that she wanted a long-term lease or things of that nature. . . . they really wanted to facilitate . . . . the sale of the real estate.").  Although it is unlikely that Maria Clarke would reap great personal financial benefits from a long-term lease, interpreting the phrase "use and enjoyment" to include the ability to lease does not imply that the property necessarily would be encumbered with a long-term lease.  In fact, the Lease Agreement at issue in this case was for a period of only one year.  *See* Lease Agreement ¶ 2.a.  Furthermore, Robles's argument that Maria Clarke's advanced age would deprive her of the benefits of leasing the property equally supports a finding that she would have opposed the property's sale.  Just as she likely would be unable to fully utilize the proceeds from leasing the property, she would be similarly unable to utilize the proceeds from its sale.  And, although her heirs would benefit from the sale of the property, they would also benefit from its lease revenue and continued appreciation.  As Maria Clarke had heirs who stood to benefit from, and indeed did benefit from, the continued ability of Axial to lease the property, Robles's contention that Maria Clarke's age evinces her intention to eliminate Axial's leasing power is unconvincing.

Although Robles contends that the revised Trust eliminated Axial's power to lease the property, Clarke acknowledges that Robles continued to lease the property, and indeed, the Clarke family continued to benefit from the lease revenue until the Clarke family and Axial became involved in a legal dispute in 2006.  *See* Undisputed Facts ¶¶ 8 ("Clarke knew that the payments were for lease revenues and nothing else."), 32 ("Clarke was aware when he accepted checks from Alvarez that the checks represented a portion of lease revenues."), 34 ("Clarke never objected to [the leasing arrangement] until someone convinced him that it was improper under

-14-

the [revised Trust]."); Clarke Dep. 36:7-44:18 (acknowledging continued knowing receipt of

rental proceeds after the revised Trust became effective); *see also* Calvo Dep. 46:24-47:13

(acknowledging that the knowing acceptance of rental proceeds is evidence that the Clarke

family consented to Axial's lease of the disputed property).  Robles translates Article 2300 of the

Civil Code of Chihuahua as stating that a non-owner may lease property "*if he has authority to*

*enter into such agreement*, in view of the *authorization granted by the owner* or as provided by

law."  Def.'s Resp. 5; *see also* Def.'s Reply in Supp. of Mot. for Partial Summ. J. for All Claims

Relating to the Lease and Guaranty Agreements 2 ("Def.'s Reply") (Doc. No. 104).  As

representative of Maria Clarke's estate and part-owner of the disputed property at the time the

Lease Agreement was negotiated, Clarke's actions undermine Robles's contention that the

purpose of eliminating the lease provision in the revised Trust was to prohibit Axial from leasing

the property.

  Further, had the Clarke family intended to eliminate Axial's ability to lease the property,

it stands to reason that, having explicitly permitted leasing in the original Clarke-Axial Trust, the

parties would have included language in the revised Trust to expressly prohibit Axial from

leasing the property.  Instead, the parties chose to adopt the broad "use and enjoyment" language

found in the revised Trust.  The argument that neither party contemplated the need to include

such language holds little weight given Axial's previous powers under the original Clarke-Axial

Trust.  Accordingly, the Court finds that the revised Trust authorized Axial to lease the property

and the Lease Agreement is a valid instrument under Mexican law.  As such, the Guaranty

Agreement is enforceable against Robles.

  Even if the Trust agreement did prohibit Axial from leasing the property, Robles's own

-15-

expert, Calvo, acknowledges that the Mexican Supreme Court does not necessarily require a lessor to prove ownership of the property in order to collect unpaid rent from a defaulting lessee. Calvo Dep. 53:25-54:22. Thus, the burden of challenging ownership for the purpose of nullifying a lease agreement falls upon the party seeking nullification. Undisputed Facts ¶¶ 99, 100 (stating that, before a party can be relieved of its obligations under a contract, a court must find that a breach has occurred). In the instant case, that burden falls on Robles, and it has failed to meet its burden.[8] Accordingly, Dublan is responsible for unpaid rent and any damage to the property. *See* Def.'s Resp. in Opp'n to Pl.'s Supplemental Mot. for Summ. J. ¶ 3 ("Def.'s Suppl. Resp.") (Doc. No. 107) ("Assuming the validity of the lease agreement, Robles does not dispute (nor has it ever disputed) that the Guaranty Agreement obligates it to pay Dublan's debts for the Lease Agreement that are covered by the Guaranty Agreement."). As the Court finds that the Lease Agreement is a valid instrument, Robles is liable to Axial for Dublan's lawful debts under that agreement.

### c.   Robles's liability for the thirty-five percent (35%) holdover premium

Axial contends that Robles is also liable to it for the additional thirty-five percent (35%) premium for Dublan's unpaid rent from June 2007 to December 2007.[9] *See* Pl.'s Mot. 20.

---

[8]     Although the Court finds that Robles has not met its burden in this regard, it notes that, as support for its claim that Robles bears the burden of proof, Axial has directed the Court's attention to a United States Supreme Court opinion addressing claim preclusion. *See* Pl.'s Mot. 7 (citing *Taylor v. Sturgell*, 553 U.S. 880, 128 S. Ct. 2161, 2171 (2008)). The Court fails to see how this supports Axial's position on the applicable burdens of proof.

[9]     The Court again notes the confusion with regard to this date. *See supra* text accompanying note 5.

Robles challenges Axial's assertion that Dublan continued to occupy the premises after the expiration of its lease.  Def.'s Resp. to Mot. for Summ. J. and Counter-Mot. for Summ. J. Ex. B at 5 ("Calvo Aff.").  Robles further argues that, even if it were liable for the unpaid rent for these months, under Mexican law, it is not responsible for the thirty-five percent (35%) premium owing from Dublan's alleged holdover.  *See* Def.'s Resp. 15 (citing Article 2388 of the Civil Code of Chihuahua for the proposition that "if [a] tenant continues occupying [a] building without any opposition from the landlord, the contract extends for an indefinite time" and that, because "the contract in this case has not been terminated," no holdover penalty may be imposed); *see also* Def.'s Resp. 15 ("[T]here is no undisputed evidence on the record that Dublan continued to occupy the premises at issue under opposition from Axial.").

The Lease Agreement indicates that Dublan agreed to pay Axial $20,269.79 per month from June 5, 2006, to July 5, 2007, along with any Value Added Tax.  *See* Lease Agreement ¶ 7. In addition, the Lease Agreement states:  "[i]f at the expiration of the Initial Term or its renewals, LESSEE does not vacate and delivers the Leased Property to LESSOR pursuant to the provisions of this Clause, LESSEE shall pay as new rent the amount of the currently paid at such time, plus and increase of 35% (thirty five per cent)."  *Id.* ¶ 18.  Robles argues that "there is no undisputed evidence on the record that Dublan continued to occupy the premises at issue under opposition from Axial" and that "Axial continued to accept payments from Robles and did not indicate that Robles was 'holding over.'"  *See* Def.'s Resp. 15.  However, included in Plaintiff's Undisputed Facts, which Robles acknowledges to be "a true and accurate representation" of Robles's position, is the fact that Axial sued Dublan in June 2007 to terminate the Lease Agreement and that Dublan did not surrender its keys to Building H until October or November 2007.

-17-

Undisputed Facts ¶ 103; *see also* Def.'s Resp. to Undisputed Facts 1.  As such, it does not appear that Dublan's holdover was "without opposition" – the condition which, according to Robles, precludes the imposition of a holdover penalty.

However, Robles also disputes the assertion that Dublan occupied Building H after the expiration of its lease in July 2007, and it provides evidence to support its position.  *See* Calvo Aff. 5 ("[T]he Leased Property was delivered to Axial . . . before the term of the [Lease Agreement] expired, and consequently, we are not within the [holdover] hypothesis contemplated by the Lease Agreement, which only applies when the Leased Property is not returned after the expiration of the initial term of the Agreement.").  Accordingly, whether Dublan continued to occupy the premises after the expiration of the Lease Agreement, and if so, for how long, is a question of fact to be resolved at trial.  Because a finding that Dublan did not extend its tenancy beyond June 2007 would obviate the need for the Court to consider the legality of any holdover premium alleged, the Court declines to engage in what could potentially be an exercise of futility until this factual dispute is resolved.

> **d.    Robles's liability for damage to the property and unpaid utility bills**

Axial also claims that it is entitled to judgment as a matter of law on the issues of Robles's liability for damage to the property and the utility bills that it paid on Dublan's behalf.  *See generally* Pl.'s Suppl. Mot.  Robles challenges the reasonableness of Axial's claim, along with the sufficiency of the evidence that Axial has provided.  *See* Def.'s Suppl. Resp. ¶ 5.  With respect to the utility costs, Robles claims that the Lease Agreement "obligates Robles only to pay utility bills <u>directly</u> to utility companies, [and that] Axial cannot claim damages relating to utility

bills under the lease agreement and Mexican law." *See id.* 1-2.

The Lease Agreement states that the "Lessee shall be responsible for all repairs and maintenance of [a] non-structural nature, including the paint of both interior and exterior walls, normal plumbing, landscaping, air conditioners and ventilation systems and appliances, and in general, for everything that is not considered a structural repair." Lease Agreement ¶ 10. In addition, it states that the Lessee "shall be liable for damages to the Leased Property caused by [its] own fault or negligence, or that of [its] agents, employees or visitors, except for losses insured by fire insurance with extended coverage endorsement." *Id.* ¶ 13.1. As evidence for the amount of damage sustained to the property, Axial has provided an Affidavit from Juan Alvarez Gottwald ("Alvarez"), principal stockholder and sole administrator of Axial. *See* Pl.'s Suppl. Mot. Ex. 12 ("Alvarez Aff."). In his Affidavit, Alvarez claims to have paid $60,956.81 to restore and seal the floors and to repaint the interior and exterior of Building H. Alvarez Aff. ¶¶ 1-2 (stating that Dublan left bolts embedded in the floors and walls and that Dublan painted its logo on the exterior walls of Building H).

Although Robles relies on Texas state law to challenge the reasonableness of the amounts claimed, it provides no evidence to show that reasonableness is a requirement under the applicable laws of Mexico, nor does it provide any evidence to dispute the amounts claimed. *See* Def.'s Suppl. Resp. ¶ 5 (citing Texas state law for the assertion that Axial bears the burden of proving that any damages sought are reasonable). Rule 56(e) states that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2). As Robles has failed to proffer any evidence on this issue, it has

failed to meet its burden in this regard.  Accordingly, the Court **GRANTS** summary judgment in

favor of Axial for damage to Building H in the amount of $60,956.81.

In addition, Axial seeks damages in the amount of $2,833.42 for an outstanding electric

bill that it paid on Dublan's behalf.  *See* Pl.'s Suppl. Mot. 1-2; Alvarez Aff. ¶ 4.  The Lease

Agreement states that the Lessee is responsible for costs associated with hook-up and

consumption charges for "all utilities necessary for the Leased Property to be utilized" by Lessee,

including sewage, gas and water.  Lease Agreement ¶ 15.  However, as noted by Robles, the

Lease Agreement does not explicitly obligate Dublan to reimburse Axial for any utility bills that

Axial pays on its behalf.  *See* Def.'s Suppl. Resp. ¶¶ 2-3.  As such, Robles argues that, under the

Guaranty Agreement, it is not liable to Axial for the outstanding bill.

In support of Axial's Supplemental Motion, Alvarez states that, in Mexico, "[w]hen a bill

is unpaid, [the Federal Power Commission] will remove the meters and other ancillary equipment

and will not resume service to a particular property until any payments in arrears are paid."

Alvarez Aff. ¶ 4.  Although Alvarez claims that, to avoid damage to the property and "to

continue to receive power on the premises," Axial needed to satisfy the debt, Axial has not

provided any evidence to show that, under the laws of Mexico, Dublan is liable to Axial for the

outstanding electric bill.  *Id.*; *see also* Fed. R. Civ. P. 56(c) (stating that the moving party has the

burden to show that it is entitled to judgment as a matter of law).  As the Lease Agreement is

ambiguous with respect to Dublan's liability for the outstanding electric bill to Axial, and Axial

has not provided the Court with evidence to support its interpretation under Mexican law, the

Court is unable to rule on the issue of liability with respect to the outstanding bill.  Accordingly,

Axial's motion for summary judgment on this issue is **DENIED**.

e.       **Robles's liability for the dishonored checks that it drafted**

Axial also seeks summary judgment for damages resulting from the two dishonored

checks that it received from Robles in the combined amount of $52,070.85.  Pl.'s Mot. 19.

Robles does not dispute that it owes Axial this amount; however, it claims that the checks were

drafted in payment for rental fees for Building H and not, as Axial claims, for rental payments on

Building B and the parking lot.  Def.'s Resp. 14 (citing Section 3.414(b) of the Texas Business &

Commerce Code for the assertion that "the drawer of a dishonored and unaccepted draft is

obliged to pay the draft . . . according to its terms at the time it was issued" and stating that

"[t]here is sufficient evidence on the record to establish that the checks were given to Axial under

the terms that the checks be used to pay for Building H").  Robles claims that Axial unlawfully

applied a subsequent check that it issued to Axial in the amount of $44,593.54 to satisfy

outstanding rental payments allegedly owed by Dublan for Building B and the parking lot when

that amount should have been credited toward rent owed by Dublan for Building H.  *Id.*; *see also*

Pl.'s Mot. 5 n.5.  Accordingly, Robles argues that there exist genuine issues of material fact

precluding summary judgment on this claim.[10]  *See* Def.'s Resp. 15.

---

[10]            It should be noted that, although Robles contends that there is
evidence precluding summary judgment on this issue, it fails to
cite to any alleged evidence.  *See* Def.'s Resp. 15; *see also*
*Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.
1998) ("The party opposing summary judgment is required to
identify specific evidence in the record and to articulate the
precise manner in which that evidence supports his or her
claim.") (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.),
*cert. denied, sub nom. Forsyth v. Vines*, 513 U.S. 871 (1994)).
However, as Axial has "abandoned its arguments over how to
apply any disputed checks and has credited all of Robles's
payments as Robles contends they should have been credited,"
the Court need not address this deficiency.  *See* Pl.'s Reply to
Def.'s Resp. to Pl.'s Mot. for Summ. J. 6 ("Pl.'s Reply") (Doc.
No. 108); *see also* Pl.'s Mot. 5 ("[F]or purposes of this motion

Because neither party disputes that Robles is liable to Axial for the dishonored checks, the Court **GRANTS** Axial summary judgment in the amount of $52,070.85, the total amount represented by the dishonored checks.  However, whether this amount is to be credited against the total unpaid rent owed by Robles to Axial is a question of fact to be determined at trial.

### f.        Robles's liability for attorneys' fees

Lastly, Axial claims that it is entitled to recover reasonable attorneys' fees and other costs and expenses incurred by its collection efforts against Robles.  Pl.'s Suppl. Mot. ¶ 6.  Robles argues that Axial has not met its burden of establishing that it is entitled to attorneys' fees. Def.'s Suppl. Resp. ¶ 6 (claiming that attorneys' fees are unwarranted because Axial has not met its burden of showing that the amount of the fees claimed is reasonable).

The general rule for awarding attorneys' fees is that the parties must bear their own costs unless some statute allows the court to award the prevailing party its fees.  *Buckhannon Bd. and Care Home, Inc. v. W. Va. Dep't of Health and Human Res.*, 532 U.S. 598, 602-03 (2001) (citing *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994)).  The Federal Rules of Civil Procedure allow federal courts presiding over diversity claims to award attorneys' fees pursuant to applicable state law.  *See McLeod, Alexander, Powell & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1487 (5th Cir. 1990) (citing FED. R. CIV. P. 54(d)).  A claim for attorneys' fees must be made by motion, and it must specify the grounds entitling the moving party to the award.  *Id.*

Texas state law embraces the general rule that parties must bear their own attorneys' fees; however, parties to a lawsuit are free to agree otherwise.  *See Akin, Gump, Strauss, Hauer &*

---

only, Axial agrees with Robles that the money should have been applied to the rent.").

*Feld, L.L.P. v. Nat'l Dev. and Research Corp.*, 299 S.W.3d 106, 120 (Tex. 2009) ("It has long

been the rule in Texas that attorney's fees paid to prosecute or defend a lawsuit cannot be

recovered in that suit absent a statute or contract that allows for their recovery.").  In the instant

case, Robles has clearly agreed to reimburse Axial for attorneys' fees resulting from Axial's

collection efforts against it.  *See* Guaranty Agreement ¶ 1 ("This Guaranty extends to and

includes any and all interest due or become due, together with all attorney's fees, costs and

expenses of collection incurred by [Axial] in connection with any matter covered by this

Guaranty."); *see also Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)

(holding that courts give contract terms their "plain, ordinary, and generally accepted meaning

unless the instrument shows that the parties used them in a technical or different sense").

        Although Robles argues that Axial has failed to meet its burden of proving reasonable

attorneys' fees, its challenge is premature.  Axial has simply motioned the Court for reasonable

attorneys' fees pursuant to Rule 54(d)(2), which requires Axial to "state the amount sought" and

the Court to subsequently "give an opportunity for adversary submissions on the motion in

accordance with Rule 43(c) or 78."  *See* Pl.'s Suppl. Mot ¶ 10; *see also* FED R. CIV. P.

54(d)(2)(B)(iii), 54(d)(2)(C).  A court "may decide issues of liability of fees before receiving

submissions on the value of services."  *See* FED R. CIV. P. 54(d)(2)(B)(iii).  However, as there

exist factual issues that remain unresolved in the instant case, the Court will rule on any motion

for attorneys' fees in accordance with Local Rule CV-7(i) after the close of trial.  To the extent

that Axial's Supplemental Motion can be construed as a motion for leave to file a motion for

attorneys' fees following trial, its motion for leave is **GRANTED**.

        **C.     Robles's Motion for Partial Summary Judgment**

The Court next evaluates the merits of Robles's cross-motion for partial summary judgment. *See generally* Def.'s Mot.  In its Motion, Robles primarily relies on the same arguments presented in its Response to Axial's Motion to support its assertion that the Lease Agreement is invalid and that it is therefore entitled to judgment as a matter of law on the issue of its liability under the Guaranty Agreement.  As the Court has rejected these arguments, to the extent that Robles relies on these arguments as support for its Motion, its Motion is **DENIED**.

In addition, Robles claims that summary judgment is warranted in its favor because Alvarez falsely represented that Axial owned Building H in the Guaranty Agreement.  Def.'s Mot. 9 (citing Guaranty Agreement).  Because the Clarke-Axial Trust, and not Axial, is the lawful owner of Building H,  Robles claims that the Guaranty Agreement is invalid.  *Id.*  Despite its claim, Robles cites no legal authority to support its argument, nor does it allege that "but for" Axial's misrepresentation, Robles would not have guaranteed Dublan's performance on the Lease Agreement.  *See id.*  Even if Robles had asserted that it would not have guaranteed Dublan's performance of the Lease Agreement absent Axial's misrepresentation, any such assertion would be questionable.  Ernesto Robles signed both the Lease Agreement and the Guaranty Agreement, and the Lease Agreement clearly stated that the property was owned by Maria Clarke and leased pursuant to a trust agreement established between Maria Clarke and Axial.  *See* Pl.'s Resp. in Opp'n to Def.'s Mot. for Partial Summ. J. for All Claims Relating to the Lease and Guaranty Agreements 7 ("Pl.'s Resp.") (Doc. No. 102) (citing Lease Agreement).  Accordingly, the Court shares Axial's belief that "it is difficult to understand how Robles may have been deceived." *Id.*  As Robles has failed to meet its summary judgment burden, its Motion is **DENIED**.

### III.    CONCLUSION

For the foregoing reasons, Axial's Motion for Partial Summary Judgment (Doc. No. 99) is **GRANTED** in part and **DENIED** in part.  Axial's Motion is **GRANTED** as to Robles's liability for unpaid rent under the Guaranty Agreement and Robles's liability for the two dishonored checks.  Axial's Motion is **DENIED** as to the amount of damages owed and Robles's liability for the holdover premium, as factual issues remain as to the length of Dublan's tenancy and the purpose of the dishonored checks.

**IT IS FURTHER ORDERED** that Axial's Supplemental Motion for Summary Judgment (Doc. No. 103) is **GRANTED** in part and **DENIED** in part.  Axial's Supplemental Motion is **GRANTED** as to Robles's liability for damage to Building H in the amount of $60,956.81.  Axial's Supplemental Motion is **DENIED** as to Robles's liability for the unpaid utility bill.

**IT IS FURTHER ORDERED** that, to the extent that Axial seeks leave to file a motion for attorneys' fees, its motion for leave is **GRANTED**.  Accordingly, Axial is **HEREBY ORDERED** to submit its motion in accordance with Local Rule CV-7(i) after the close of trial. *See* W.D. Tex. Civ. R. 7(i) (outlining procedure for submitting claims for attorneys' fees).

**IT IS FURTHER ORDERED** that Robles's Motion for Partial Summary Judgment (Doc. No. 95) is **DENIED**.

**SO ORDERED.**

**SIGNED** on this 21st day of July 2010.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE